**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

IVY HEMBRADOR,                               )
      Plaintiff(s),                    )
                                       )
    vs.                                    )
                                       )   Case No. 4:19-cv-03203
PRUGEN, LLC,                                 )
                                       )
      Defendant(s).                    )
                                       )

**<u>Memorandum and Order</u>**

When Ivy Hembrador answered her supervisor's phone call on August 1, 2017, she learned that she had been terminated, much to her dismay.  Believing that her termination stemmed from discriminatory animus towards women, Hembrador filed suit against PruGen, LLC and her former supervisor, Mike Pinto.  Defendants maintain they fired her simply because of her poor sales and that no evidence demonstrates that any sex discrimination or retaliation occurred.  Accordingly, Defendants move for summary judgment, which the Court evaluates below.

## I.      Background and facts

Hembrador filed suit in 2018, asserting two counts under the Missouri Human Rights Act.  Count I asserts a claim for sex discrimination, contending that Defendants fired her because she is a woman.  Doc. 5 at pp. 4–6.  Count II asserts a claim for retaliation, stating that Defendants fired her in retaliation for her complaints about sex discrimination.  *Id.* at pp. 6–7.  Defendants now move for summary judgment as to both Counts, arguing that no evidence supports the claims.  Doc. 44.  Hembrador opposes the motion and requests oral argument.  Doc.

1

50.  The summary judgment record establishes the following as undisputed facts, except as noted.

### A.    Facts

PruGen develops, manufactures, and sells generic and branded prescription and over-the-counter dermatology medications.  Declaration of Mike Pinto at ¶ 2.  PruGen divides the dermatology products it sells into two categories: acne and dermatitis.  Pinto Decl. at ¶ 6; Ivy Hembrador Deposition Transcript at 34:5–9; 44:14–19.  PruGen employed salespeople, called Territory Managers, throughout the country to sell its products to healthcare providers.  Pinto Decl. at ¶ 5.  During Hembrador's employment with PruGen, PruGen employed approximately ninety-five Territory Managers; half the Territory Managers sold acne products and half sold dermatitis products.  Pinto Decl. at ¶ 7; Hembrador Depo. at 44:14–19.

Matt Walterscheid, a Territory Manager at PruGen, encouraged Hembrador to apply for a position at PruGen.  Mike Pinto, PruGen's Director of Sales, hired Hembrador as a Territory Manager in June 2016.  Pinto Decl. at ¶ 4; Hembrador Depo. at 32:3–6; 41:2–4; 97:18–20.  Hembrador sold dermatitis products in a territory which includes parts of Missouri, Illinois, and Kentucky.  Pinto Decl. at ¶ 8; Hembrador Depo. at 32:3–19; 34:5–9.  Walterscheid sold acne products in the same area.  Pinto Decl. at ¶ 4; Hembrador Depo. at 33:2–14; 34:5–9; 43:2–7.  During Hembrador's employment with PruGen, Pinto supervised PruGen's Territory Managers, including Hembrador and Walterscheid.  Pinto Decl. at ¶¶ 4, 10; Hembrador Depo. at 32:20–33:1; 43:2–9.

Hembrador sold an average of about 19 new prescriptions per day, with her highest average number of prescriptions sold per day reaching 25.08 new prescriptions.  Pinto Decl. at ¶ 13.  During Hembrador's employment with PruGen, Territory Managers sold, on average, across

the company, between about 40 and 60 new prescriptions per day.  Pinto Decl. at ¶ 12.  Acne representatives sold more new prescriptions than dermatitis representatives.  Pinto Depo: 51:6–14.

A Territory Manager's primary indicator of job performance is measured by the average number of new prescriptions sold per day on a monthly basis within the assigned territory.  Pinto Decl. at ¶ 11.  PruGen did not provide Hembrador with a formal sales goal of units per day or a percentage growth.  Hembrador Depo. at 101:5–102:10.  PruGen did not tell Hembrador the new number of prescriptions she wrote each month or that she was not meeting expectations.  Hembrador Decl. at ¶ 4.  Hembrador did not view any sales charts comparing her sales to others at the company.  Hembrador Decl. at ¶ 1.

The parties dispute whether Hembrador received a performance review.  Hembrador states that she never received a performance review from Pinto.  Hembrador Decl. at ¶ 3.  Pinto testified "I think we had conversations about having to improve. I think we talked about strategies and wanting to improve."  Pinto Depo. at 46:22–47:7.  Pinto also testified that Territory Managers, including Hembrador, "know full well whether they're performing or not. They should. If they don't, they're not paying attention. Because if you came in, I don't know about you, but if you came in and you were at 17 prescriptions in September and 17 prescriptions at May, I don't know that you can consider yourself a major contributor to the success of the organization, you know."  Pinto Depo. at 46:22.

### 1.    National sales meeting and ensuing events

From May 16–18, 2017, prior to Hembrador's termination, PruGen held a national sales meeting in Puerto Rico.  Pinto Decl. at ¶ 25; Hembrador Depo. at 46:10–19.  Territory Managers, including Hembrador and Walterscheid, attended the national sales meeting.  Pinto Decl. at ¶ 26.

Hembrador claims the sales meeting was a "drunken party of debauchery," Hembrador Decl. at ¶ 6, but Defendants rightly point out that this constitutes a personal opinion, which the Court will not consider.  *See Woods v. Wills*, 400 F. Supp. 2d 1145, 1162 n. 7 (E.D. Mo. 2005) ("The Court therefore does not consider statements . . . which merely constitute personal opinions as opposed to facts.").  Hembrador became uncomfortable after learning that, at the sales meeting, another PruGen employee kissed a woman who was not his wife.  *Id*.  Hembrador did not want to hang out at the pool with Walterscheid because of the debauchery.  *Id*.  Walterscheid confirmed the details of the sales meeting during a lunch with Dr. Wang on May 30, 2017, during which he stated that everyone should be on Doryx, which is an antibiotic used for gonorrhea.  *Id*. Hembrador did not complain about the sales meeting because she feared retaliation.  *Id*.

At least three times, Walterscheid commented to Hembrador that she did not hang out at the pool during the sales meeting, including telling Dr. Robert Schwarze and his staff during a lunch at the doctor's office soon after Walterscheid returned from Puerto Rico.  Hembrador Depo. 62:6–65:12; Doc. 52-9.  These comments offended Hembrador.  Hembrador Depo. 65:13-15.  Specifically, Hembrador stated

> [i]t was offensive, you know. I told him I work hard enough in the territory. I
> showed up at the meeting, I showed up when I was supposed to show up. I showed
> up at the dinners. I should be allowed to walk at the beach during my free time.
> Those free times are given to us to do what we want. When [Walterscheid] said to
> me, "Ivy that's what happens when you don't hang out with me," that was a very
> condescending tone.

Hembrador Depo. 65:13–25.  Hembrador complained to Walterscheid about his comments to Dr. Schwarze and to her over a period of weeks about her not hanging out with him at the pool in Puerto Rico.  Hembrador Depo. at 62–66; 120–121.  Hembrador stated that "the last straw" regarding Walterscheid's comments occurred when Hembrador asked Walterscheid for help with the app PruGen rolled out in June after the national sales meeting, and he responded "this is what

4

happens when you don't hang out with me at the pool."  Hembrador Depo. at 62–66; 120–121.
Hembrador told Walterscheid to "stop this." Hembrador Depo. at 65:12.

Pinto stated that Walterscheid and Hembrador "were like two peas in a pod" and "very
complimentary of each other," before the Puerto Rico incident.  Pinto Depo. at 20–21.  In
reference to Hembrador, Walterscheid stated that he "thought we were friends at the time" when
they were in Puerto Rico.  Walterscheid Depo. at 33–34.  Before the national sales meeting,
Walterscheid had made comments about the attractiveness of certain women.  Hembrador Depo.
at 55:15–58:10.  For example, they ran into a sales representative for Pfizer, Lori Johnson, and
Walterscheid commented about how "hot" she was and that he could not stop staring at her.
Hembrador Depo. at 56:1–12.  These comments did not "really" bother Hembrador "until
[Walterscheid] would not stop complaining that she would not hang out with him at the pool."
Hembrador Depo. 58:4–10.

As a result of Hembrador's anxiety over Walterscheid's comments to her about not
hanging out at the pool, she stopped talking to him.  Hembrador Depo. at 113:1–6.  On July 11,
2017, Pinto called Hembrador and stated "Ivy, I can feel that there's something going on
between you and Matt [Walterscheid]."  Hembrador Depo. 126:7–12.  Hembrador responded,
"[w]ell, Mike, [Walterscheid] keeps complaining that I didn't hang out with him at the pool."
Hembrador Depo. 126:13–17.  Before any further conversation occurred during the July 11 call,
Pinto ended it because he needed to answer another call he was receiving.  Hembrador Depo.
126:7–17.

Pinto called Hembrador about two weeks later and stated, "I know there is something
going on between you and Matt [Walterscheid] and I want you to fix it now. I want you to fix it
right away. If you don't fix it now, I will fix it for you."  Hembrador Depo. 68:19–69:24;

126:22-25.  Hembrador responded, "Yes, I will."  Hembrador Depo. 127:5–9.  At her deposition, Hembrador could not remember any statements (other than those described above) that she made to Pinto during the telephone calls which occurred on July 11 or the one about two weeks later. Hembrador Depo. 127:13–24.

On July 27, 2017, Walterscheid and Hembrador exchanged a series of emails. Walterscheid sent an email to Hembrador with the following opening paragraph: "Im [sic] not really sure what I did to make you want to stop talking to me but whatever it is we need to get over it. I just want to continue to grow the business and make a lot of money. I am sure you feel the same way."  Walterscheid Decl. at ¶ 9; Doc. 44-3 at p. 4.  Plaintiff responded via email, stating:

> Let me tell you this, I did not like the fact that you kept repeating that I did not hang out at the pool in Puerto Rico, five weeks after we got back. If you said it once or twice I've hear [sic] it enough. You don't have to repeat it every week. It's not part of my job to hang out with you. I work hard enough in the field and I should be allowed to enjoy our meeting the way I want to, not the way you want me to.
>
> You keep telling me to cancel lunches because they are a waste of time and money. You are right. You are not my boss [sic] that is why you should stop telling me what I should and should not do. The way you told me to cancel the lunch with West Co [sic] Derm on June 21 was so condescending.

Doc. 44-3 at p. 3.  In response, Walterscheid stated "I am sorry if I ever offended you or talked to you in a condescending way."  *Id*.  Hembrador then stated, "I have aired my grievance and got it out of my chest. I'm all good now. I want to work together and be successful. We can sit down and coordinate on a regular basis if you want. . . . Moving forward, I appreciate you saying things in a nicer way."  *Id*. at p. 6.  At her deposition, Hembrador confirmed that "all was good" between her and Walterscheid as of July 27, 2017.  Hembrador Depo. at 132:18–21.

The exchange of emails made Hembrador feel comfortable that all was good between

her and Walterscheid, which is why her termination came as a shock.  Hembrador Decl. at ¶ 7. Hembrador believed that this email exchange fixed the issues with Walterscheid, and thus thought she had done what Pinto had asked her to do.  She did not know she would be fired a few days later.  *Id*. at ¶ 8.

### 2. Hembrador termination

Pinto terminated Hembrador by email on August 1, 2017.  Pinto Decl. at 20; Doc. 46-1 at p. 5.  The email states, in part, "although we appreciate your efforts to date but [sic] we have decided that your maturation, performance and or approach is not up to our expectations."  Doc. 46-1 at p. 5.  Shortly after sending the termination email, Pinto had a phone call with Hembrador. Hembrador Depo. at 70:13–21; 71:4–20.  During this call, Pinto told Hembrador that "we wanted to fire you last week, but we waited until today. Ivy, you're not a good fit. You don't fit in.  Do you have any questions for me?"  Hembrador Depo. 72:2–9.  The phone call came as a shock to Hembrador.  *Id*. at 72:14–18.

On the same day, Pinto terminated other Territory Managers, including a male, for similar performance issues.  Pinto Decl. at ¶ 23.  Within days of Hembrador's termination, Pinto hired a woman to replace her.  Pinto Decl. at ¶ 24; Hembrador Depo. at 116:3–8.

When asked at her deposition "specifically, what would you tell me is the evidence that the termination was based on you being a woman rather than what Mr. Pinto says in his email," Hembrador responded as follows:

> [t]he issue with me and Matt started because of his comments about not hanging out with me at the pool. That, alone, is -- that alone is -- and for it to be repeated over and over. Why do I need to hang out with you at the pool? And then when I fought back, I knew he called Pinto and that's why Pinto called me. And the next thing you know, I was terminated. So that's retaliation . . . .

Hembrador Depo. at 114:7–23.  Hembrador also testified that Walterschied treated her

differently because she was a woman by making comments about women's appearances, asking

her to cook for a pool-party without asking her permission, and from the decision to make

Paducah, Kentucky no longer part of her and Walterscheid's territory without consulting her.

Hembrador Depo. at 111:12–112:2.  Hembrador stated that he treated her differently by asking if

she used a "dildo," but Walterscheid denies making such a comment.  Hembrador Depo. at

111:12–20; Walterscheid Depo. 30:20–23.

At the conclusion of her deposition, Hembrador's counsel asked her "[w]hen Mr. Pinto

says that 'your maturation or performance or approach is not up to our expectations,' why do you

think those statements are false?"  Hembrador Depo. at 157:10–13.  In response, Hembrador

stated:

> I believe I'm a good employee, as the numbers would show, and the performance
> numbers would prove that. Also, my calendar is a good gauge of activity I do on a
> daily basis. It's not all the calls I make. Those are just the breakfast and the lunches.
> And if you go back to the calendar, you will see that almost on a daily basis, I'd
> either have a breakfast or lunch, which shows I am taking the time to promote the
> products to our customers. And taking the time means educating them on the
> benefits of our products.

Hembrador Depo. at 157:14–23.

## II.    Standard

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  In ruling on a motion for summary

judgment, the Court is required to view the evidence in the light most favorable to the non-

moving party and must give that party the benefit of all reasonable inferences to be drawn from

the underlying facts.  *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987).  The

moving party bears the initial burden of showing both the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); Fed. R. Civ. P. 56(a).

In response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). Self-serving, conclusory statements without support are insufficient to defeat summary judgment. *Armour and Co., Inc. v. Inver Grove Heights*, 2 F.3d 276, 279 (8th Cir. 1993). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.   Discussion

Hembrador asserts claims for sex discrimination and retaliation under the Missouri Human Rights Act, Mo. Rev. Stat. § 213.010 *et seq.* Hembrador also raises a hostile work environment claim under the MHRA for the first time in her opposition to Defendants' motion for summary judgment. In light of the recent amendments to the MHRA, before assessing each claim, the Court first explains the standard it applies to Hembrador's claims.

### A.   Applicable standard

Previously, Missouri courts reviewed the causal element of MHRA claims on a "contributing factor" basis, meaning a plaintiff could succeed in her MHRA claim if the prohibited act was merely one contributing part of the adverse action against her. *See, e.g., Holmes v. Kansas City Mo. Bd. of Police Comm'rs ex rel. Its Members,* 364 S.W.3d 615, 627

(Mo. Ct. App. 2012); *Porter v. City of Lake Lotawana*, 651 F.3d 894, 898 (8th Cir. 2011) (articulating the Missouri "contributing factor" standard as permitting a plaintiff to recover as long as "her complaint of discrimination was 'a reason' for" dismissal, compared to the federal-law requirement that it be "the reason.").  Following the 2017 amendments to the MHRA, effective August 28, 2017, an employer violates the MHRA if the employee's protected status constituted the motivating factor in an adverse employment action.  Mo. Rev. Stat. § 213.010(2) (2017); Mo. Rev. Stat. § 213.101(4) (2017) (amended statute expressly abrogating previous case law relating to the "contributing factor" standard); *Bram v. AT&T Mobility Servs., LLC*, 564 S.W.3d 787, 794 (Mo. Ct. App. 2018).  "This new standard is analogous to the one used in employment-discrimination claims under federal law, and imposes a higher burden upon the employee than the prior 'contributing factor' standard."  *Bram*, 564 S.W.3d at 794–95; *Jackson v. Gen. Motors, LLC*, No. 4:18-CV-1243 RLW, 2020 WL 3469334, at *25 (E.D. Mo. June 25, 2020).

Defendants argue that the 2017 amendments do not apply to this case because Hembrador's termination occurred before the amendments went into effect in August 2017. Doc. 57 at n.3.  The Court agrees.  In similar cases, "Missouri courts have consistently applied the version of the law in effect at the time of the claimed discriminatory act."  *Brown v. Adams & Assocs., Inc.*, No. 4:19-CV-01864-MTS, 2020 WL 7360336, at *3 (E.D. Mo. Dec. 15, 2020) (citing *Wiedner v. Ferrellgas, Inc.,* 607 S.W.3d 231, 237–39 (Mo. Ct. App. 2020); *Folsom v. Missouri State Highway Patrol*, 580 S.W.3d 645, 650 n.1 (Mo. Ct. App. 2019); *Bram v. AT&T Mobility Servs., LLC*, 564 S.W.3d 787, 794–95 (Mo. Ct. App. 2018)).  Thus, because Hembrador's cause of action accrued before August 27, 2017, the Court applies the "contributing factor" standard and cases applying the pre-amendment standard.

The "contributing factor" standard applies to each of Hembrador's claims.  *See Wallace v. DTG Operations, Inc.*, 563 F.3d 357, 360 (8th Cir. 2009) (citing *Hill v. Ford Motor Co.*, 277 S.W.3d 659, 665 (Mo. banc 2009) (applying the "contributing factor" standard to retaliation and discrimination claims); *M.W. by & though K.W. v. Six Flags St. Louis, LLC*, 605 S.W.3d 400, 409 (Mo. Ct. App. 2020) (applying the "contributing factor" standard to a hostile work environment claim).  However, while federal law applies the "motivating factor" standard rather than the "contributing factor" standard applicable under the MHRA, the Court may still apply federal employment discrimination law to the extent federal law is "applicable and authoritative under the MHRA."  *Heuton v. Ford Motor Co.*, 930 F.3d 1015, 1019 (8th Cir. 2019), *reh'g denied* (Aug. 30, 2019) (citation omitted).

### B.     MHRA sex discrimination under the "contributing factor" test

The MHRA makes it an unlawful employment practice for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, national origin, sex, ancestry, age or disability."  Mo. Rev. Stat. § 213.055.1(1)(a) (2016). "Nothing in this statutory language of the MHRA requires a plaintiff to prove that discrimination was a substantial or determining factor in an employment decision; if consideration of age, disability, or other protected characteristics contributed to the unfair treatment, that is sufficient." *Ruppel v. City of Valley Park*, 318 S.W.3d 179 (Mo. Ct. App. 2010) (quoting *Daugherty v. City of Maryland Heights*, 231 S.W.3d 814, 819 (Mo. banc 2007).  "To establish a *prima facie* case of sex discrimination in the workplace, the employee must satisfy four elements: (1) she was a member of a protected class; (2) she was qualified to perform her job; (3) she suffered an adverse employment action; and (4) she was treated differently from similarly situated males."  *Id.*

(quoting *Buchheit, Inc. v. Missouri Commission on Human Rights*, 215 S.W.3d 268, 277 (Mo. Ct. App. 2007)).

Missouri courts do not require a plaintiff to present evidence of similarly-situated employees to overcome summary judgment, but this type of evidence can give rise to a factual issue regarding whether a discriminatory reason contributed to an employer's conduct. *Denn v. CSL Plasma, Inc.*, 816 F.3d 1027, 1034 (8th Cir. 2016) (citing *Holmes*, 364 S.W.3d at 627). "Employees are similarly situated if they are accused of similar conduct and are disciplined in different ways." *Id*. (quoting *Jain v. CVS Pharmacy, Inc.*, 779 F.3d 753, 759 (8th Cir. 2015) (internal quotation marks omitted)). Hembrador does not identify any similarly-situated employees. To the contrary, the record reflects that PruGen fired other employees, including a male, for performance issues the same day it terminated Hembrador. Courts find a lack of discriminatory animus when the plaintiff-employee was terminated along with individuals that did not share the same protected characteristic. *See e.g.*, *Agard v. Mallinckrodt Enterprises, LLC*, No. 4:16CV443 HEA, 2018 WL 488933, at *9 (E.D. Mo. Jan. 19, 2018); *see also Shore v. Children's Mercy Hosp.*, 477 S.W.3d 727, 732 (Mo. Ct. App. 2015) (explaining that "[w]hile disparate treatment of members of a particular protected class could show discrimination," the Caucasian plaintiff failed to "show that he was treated differently" than non-Caucasians (citation omitted)).

Unable to point to any similarly-situated employees, Hembrador must provide "some other evidence that would give rise to an inference of unlawful discrimination." *Lampley v. Mo. Comm'n on Human Rights*, 570 S.W.3d 16, 24 (Mo. 2019) (citation omitted). Hembrador claims the following support an inference of discrimination: (1) Walterscheid's comments about women; (2) his complaints about not hanging out by the pool; (3) asking her if she used a dildo;

(4) offering for her to cook at the pool party without asking her permission; (5) removing

Paducah from her territory without consulting her, (6) Pinto hanging up on her to take another

call; (7) Pinto calling Hembrador on July 11, 2017 to say there was something going on between

her and Walterscheid because Walterscheid had called him and told Pinto that there was a

problem and he did not know why, even though Walterscheid knew that Hembrador was not

happy with his comments, and (8) that her relationship with Walterscheid was "fine" until she

did not hang out by the pool, demonstrating that not playing in the "boys club's" game will result

in termination.  Doc. 55 at pp. 11–12.

Hembrador fails to create an inference that her sex contributed to her termination.  Most

of what she claims supports an inference of sex discrimination relates to her relationship with

Walterscheid, but he did not have the authority to terminate Hembrador.  Rather, Pinto held the

authority to terminate her.  Thus, Hembrador must establish either that bias towards women

influenced Pinto's decision to terminate her or that Walterscheid's actions or comments can be

linked Pinto's decision to terminate Hembrador.  *See Denn*, 816 F.3d at 1035.

Pinto had two conversations with Hembrador regarding her relationship with

Walterscheid.  Pinto called Hembrador because he could feel "something going on between" her

and Walterscheid.  Hembrador told him their issues stemmed from Walterscheid stating that she

did not hang out by the pool with him.  Two weeks later, Pinto called Hembrador again to tell

her that he knew there was "something going on" between Hembrador and Walterscheid and told

her to fix it.

 Those discussions do not create an inference that Pinto harbored any discriminatory

animus towards Hembrador, or that, as explained more fully below in addressing Hembrador's

retaliation claim, she was complaining about sex discrimination.  While Pinto hung up on her, he

did so simply to take another call and no facts support that he hung up out of discriminatory animus. Hembrador also offers nothing beyond mere speculation that Pinto and Walterscheid spoke to each other about Hembrador. And what Hembrador claims Walterscheid stated during that conversation undermines her position, as he did not tell Pinto anything other than he did not know what the problem was. Finally, her contention that the reassignment of Paducah supports an inference of discrimination stems from nothing beyond that men made the decision without consulting her. Thus, even if the Court concluded that Walterscheid's inappropriate comments regarding the attractiveness of women, use of a dildo, or volunteering her to cook for a party created an inference of sex discrimination, the record does not connect those comments to Pinto's decision to terminate Hembrador. Accordingly, Hembrador has failed to create an inference of discrimination in the termination decision. *See Denn*, 816 F.3d at 1035; *Shirrell v. Saint Francis Med. Ctr.*, 24 F. Supp. 3d 851 (E.D. Mo. 2014), *aff'd sub nom. Shirrell v. St. Francis Med. Ctr.*, 793 F.3d 881 (8th Cir. 2015).

Other evidence in the record further supports that Hembrador's sex did not contribute to her termination. First, that PruGen replaced Hembrador with a woman "directly contradict[s] any argument that [she] was discriminated against because of h[er] gender." *Carter v. CSL Plasma Inc.*, 63 F. Supp. 3d 1034, 1046 (W.D. Mo. 2014). Further, Walterscheid encouraged Hembrador to apply to the sales position at PruGen and Pinto did not interview anyone else. Nearly a year later, Pinto terminated Hembrador. Under these circumstances, "an inference arises that [the] decision was not motivated by discriminatory animus." *Owens v. U.S. Dept. of Army*, 312 Fed. Appx. 831, 835 (8th Cir. 2009) (citing *Peterson v. Scott County*, 406 F.3d 515, 522 (8th Cir. 2005) ("This court has previously observed that it is not likely that a supervisor would hire an older woman and then discriminate against her on the basis of her age and

14

gender.") (citation omitted); *Herr v. Airborne Freight Corp*., 130 F.3d 359, 362–63 (8th Cir.1997) ("There is a strong inference that discrimination was not a motivating factor if the same person hired and fired the plaintiff within a relatively short period of time."); *Stone v. McGraw-Hill Glob. Educ. Holdings, LLC*, 126 F. Supp. 3d 1077 (E.D. Mo. 2015), *aff'd sub nom. Stone v. McGraw Hill Fin., Inc*., 856 F.3d 1168 (8th Cir. 2017).

Lastly, although the pre-amendment version of the MHRA does not require an employee to show that an employer's stated reasons for taking adverse action were pretextual, evidence undermining the credibility of those reasons can give rise to a factual issue as to whether a discriminatory reason was a contributing factor to an employer's conduct. *Denn*, 816 F.3d at 1033 (citing *Lomax v. DaimlerChrysler Corp.,* 243 S.W.3d 474, 483 (Mo. Ct. App. 2007). "Indeed, 'rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination.'" *Ferguson v. Curators of Lincoln Univ*., 498 S.W.3d 481 (Mo. Ct. App. 2016) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)). Defendants have offered a legitimate non-discriminatory reason for her termination. Defendants state that they terminated Hembrador because she lagged in sales. Territory Managers averaged between 40–60 new prescriptions per day. Comparatively, Hembrador sold an average of about 19 new prescriptions per day, with her highest average number of prescriptions sold per day reaching 25.08 new prescriptions.

Hembrador argues that Defendants' legitimate non-discriminatory reason has no basis in fact. First, she argues the sales chart illustrating the average sales numbers of all Territory Managers is not supported by admissible evidence. Defendants argue that the sales chart constitutes a business record pursuant to Federal Rule of Evidence 803(6). The Court agrees with Defendants.

To constitute a business record under Rule 803(6), the party offering the record must establish:

> (A) the record was made at or near the time by — or from information transmitted by — someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Defendants have established each of these elements.  The sales chart is a true and accurate copy of a document used internally by PruGen to track sales numbers and determine the performance of Territory Managers.  Doc. 46-1 at 3.  Additionally, PruGen kept the document "in the routine and ordinary course of business."  *Id*.  Pinto testified about the contents of this chart at his deposition and explained that it represents the average sales of all Territory Managers.  Pinto Depo. 64:6–66:3.  Pinto also stated that the information depicts Hembrador as having below-average sales and that he relied upon the sales chart in terminating Hembrador as well as other low performers.  *Id*. at 65:15–67:10.  Finally, Hembrador has not established that the source of the information or the method or circumstances of preparation indicate a lack of trustworthiness.  Accordingly, the Court concludes that the sales chart constitutes a business record under Federal Rule of Evidence 803(6).

Next, Hembrador argues that even if the chart is admissible, one cannot ascertain from the chart that Hembrador was a below-average salesperson.  She contends, without any admissible evidence, that the chart depicts the average sales of each territory team—meaning that the chart depicts the combined sales of Hembrador and Walterscheid.  However, as Pinto stated in his deposition, the chart illustrates the average daily prescriptions sold by a Territory Manager,

calculated by totaling the daily sales of all ninety-five Territory Managers and dividing by 95. Thus, Hembrador's attempt to dispute the chart on this ground fails.

However, Hembrador also argues that because acne sales representatives sold more products than those selling dermatitis, the chart does not show whether Hembrador was a below-average dermatitis salesperson. Much of Hembrador's basis for this argument is unsupported by the record, except for Pinto's testimony that acne sales representatives did sell more products than the dermatitis sale representatives on average. For this reason, Hembrador contends that the chart cannot illustrate that she was a below-average dermatitis salesperson.

Nevertheless, the record reflects that she was a below-average Territory Manager. While Hembrador states that Defendants never provided her with the sales numbers of other Territory Managers because they redacted the sales numbers, she never moved to compel Defendants to produce this information. Moreover, even if the Court considered Hembrador's unsupported conclusion that acne sales representatives sold new prescriptions at a 2:1 ratio more than dermatitis representatives, the chart would still show that she had below-average sales. For example, if the Territory Managers averaged 50 prescriptions per day, then a 2:1 ratio would mean that the average acne sales representative sold 66 new prescriptions and the average dermatitis sales representative sold 33 new prescriptions, well above Hembrador's average of 19 new prescriptions a month. In short, even accepting Hembrador's argument that acne sales representatives sell twice as many prescriptions, the chart still demonstrates that Hembrador fell below average.

In sum, the record reflects that Hembrador performed below average, PruGen replaced her with a woman, the same individual hired and fired her, and no evidence suggests that Pinto's decision to terminate Hembrador stemmed from or was influenced by discriminatory animus.

17

Accordingly, the record does not support that Hembrador's sex contributed to her termination, and the Court grants summary judgement on Hembrador's sex-discrimination claim.

### C.      MHRA retaliation under the "contributing factor" test

Mo. Ann. Stat. § 213.070 (2016) makes it an unlawful discriminatory practice to "retaliate or discriminate in any manner against any other person because such person has opposed any practice prohibited by this chapter."  To establish a prima facie case of retaliation under the MHRA, Hembrador must prove that: (1) she complained of discrimination, (2) PruGen took adverse action against her; and (3) a causal relationship existed between the complaint and the adverse action.  *McCrainey v. Kansas City Missouri Sch. Dist*., 337 S.W.3d 746, 752–53 (Mo. Ct. App. 2011) (citation omitted).  Causation, under the pre-amendment version of the MHRA, "require[s] a showing that the complaint of discrimination was a 'contributing factor' to the adverse employment action."  *Holmes v. Kansas City Pub. Sch. Dist.*, 571 S.W.3d 602, 611 (Mo. Ct. App. 2018) (citation omitted).

Courts have found that when the alleged complaint of discrimination does not reference a protected characteristic or indicate that the complained-of conduct or comments were due to animus towards a protected characteristic, the plaintiff failed to make a complaint of discrimination under the MHRA.  For example, in *Carter v. CSL Plasma*, the plaintiff argued that he had complained of sex discrimination when he complained that he received a corrective action as backlash.  63 F. Supp. 3d 1034, 1048 (W.D. Mo. 2014).  The court found he failed to engage in a protected activity under the MHRA because the "backlash" complaint "did not relate to gender or mention gender in any way."  *Id*.  Similarly, in *James Mounsey v. St. Louis Irish Arts Inc*., the plaintiff did not complain about race discrimination because his letter "did not reference discrimination based on race."  No. 4:14-CV-01633-AGF, 2016 WL 4124113, at *11

18

(E.D. Mo. Aug. 3, 2016).  Lastly, in *Shore v. Children's Mercy Hosp.*, the court concluded that the plaintiff did not complain of race discrimination because he never complained that his colleague "had discriminated against him on the basis [of race]."  477 S.W.3d at 735.

Here, Hembrador presented no evidence that she complained of sex discrimination. Hembrador complained to Walterscheid about his repeated comments about her not hanging out by the pool with him.  She told him to "stop this."  Hembrador also complained to Pinto about Walterscheid's comments regarding hanging out by the pool.  After Pinto called Hembrador and stated "Ivy, I can feel that there's something going on between you and Matt [Walterscheid]." Hembrador Depo. 126:7-12.  Hembrador responded, "Well, Mike, [Walterscheid] keeps complaining that I didn't hang out with him at the pool." *Id.* at 126:13–17.

From those two instances, a reasonable jury could not conclude that Hembrador complained about sex discrimination.   In complaining about the comments, Hembrador did not indicate that these comments were made to her because she was a woman or that such comments amounted to discriminatory conduct.  In fact, Hembrador did not characterize Walterscheid's comments as sex discrimination or even mention that they related her status as a woman when asked to describe how these comments made her feel in her deposition.  Instead, she described them as offensive and condescending, never mentioning her sex as a reason for the statements. In short, she did not make a complaint that she was being treated differently based on her membership in a protected class.

In sum, the record does not support Hembrador's contention that her complaints about Walterscheid's comments about not hanging out by the pool amounted to a complaint about sex discrimination.  Accordingly, Hembrador failed to show she complained about sex

19

discrimination, and thus, the Court grants summary judgment in favor of Defendants as to the

MHRA retaliation claim.

### D. Hostile work environment

Hembrador asserts that Defendants' actions created a hostile work environment.

However, Hembrador raised the hostile work environment claim for the first time at summary

judgment.  A party cannot raise a new claim at the summary judgment stage.  *WireCo*

*WorldGroup, Inc. v. Liberty Mut. Fire Ins. Co.*, 231 F. Supp. 3d 313, 318 (W.D. Mo. 2017)

(citing *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004), *N. States*

*Power Co. v. Fed. Transit Admin.*, 358 F.3d 1050, 1057 (8th Cir. 2004)); *see also Sasser v. Ark.*

*Highway & Transp. Dep't*, No. 5:96-CV-00466-WRW, 2007 WL 4365503 at *1 (E.D. Ark. Dec.

10, 2007) (citing cases from the 8th, 7th and 11th Circuits).  At the summary judgment stage, the

proper procedure for a plaintiff asserting a new claim is to seek to amend the complaint in

accordance with Rule 15(a) of the Federal Rules of Civil Procedure.  *Sasser*, 2007 WL 4365503

at *1.  Because Hembrador did not seek to amend her complaint to add this new claim, the Court

need not consider this claim and grants summary judgment on this basis alone.

Moreover, even if this claim could go forward, Hembrador's claim would still fail.  "To

prevail on a claim of discrimination due to a hostile work environment, a plaintiff must show: (1)

she is a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3)

her gender was a contributing factor in the harassment; and (4) the harassment affected a term,

condition, or privilege of employment."  *M.W. by & though K.W. v. Six Flags St. Louis, LLC*,

605 S.W.3d 400, 409 (Mo. Ct. App. 2020) (citations omitted).  "Further, in a case of non-

supervisory co-worker harassment, as here, a plaintiff must show an additional element to

impose employer liability: that the employer knew or should have known of the conduct and failed to take proper remedial action." *Id.* (citations omitted).

In support of her claim for hostile work environment under the pre-amendment standard, Hembrador points to the same facts that she contends creates an inference of discrimination, including Walterscheid's comments about women, such as describing a Pfizer representative as "hot" and whether she used a "dildo." While both distasteful and inappropriate, these facts fail to establish a hostile work environment under applicable law. "State and federal caselaw interpreting the MHRA sets a high bar for action sexual harassment." *Six Flags St. Louis*, 605 S.W.3d. at 412 (citing *LeGrand v. Area Res. for Cmty. & Human Servs.*, 394 F.3d 1098, 1102 (8th Cir. 2005)). "More than a few isolated incidents are required, and the alleged harassment must be so intimidating, offensive, or hostile that it poisoned the work environment." *LeGrand*, 394 F.3d at 1101 (citations and internal quotations omitted). When considering whether a hostile work environment exists, courts "look to a number of factors, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *see also Six Flags St. Louis*, 605 S.W.3d. at 412.

Hembrador points to some isolated incidents during which offensive comments were made. Additionally, Hembrador described Walterscheid's comments about not hanging out by the pool as merely offensive and condescending. Except for Walterscheid's comment regarding her use of a dildo, which he denies ever saying, none of the other comments include overtly sexual overtones and none of the actions included physical touching. The Court does not

condone this type of conduct, but under governing precedent, it does not meet the severe or pervasive standard.

Courts have found more severe conduct did not establish a hostile work environment. For example, in *Legrand*, the court found that three instances of unwelcome sexual advances over a nine-month period, including graphic sexual propositions and even incidental unwelcome sexual contact, did not constitute a hostile work environment.  394 F.3d 1098.  In *Paskert v. Kemna-ASA Auto Plaza, Inc*., the plaintiff alleged an "instance of unwelcome physical contact, one or two statements by [a male employee] that he could 'have [plaintiff],' and several statements about how [the male employee] never should have hired a female and wanted to make [the plaintiff] cry."  950 F.3d 535, 538 (8th Cir. 2020).  The court found that such behavior did not meet the "severe or pervasive standard applied in [the Eighth] circuit."  *Id*.  Accordingly, given that these cases included significantly more severe conduct than what Hembrador presents, the Court finds that her hostile work environment claim fails.

Additionally, Hembrador has not produced evidence establishing that Pinto or another PruGen supervisor knew or should have known of the conduct.  "An employer gains actual knowledge through an employee reporting the harassment."  *Six Flags St. Louis*, 605 S.W.3d. at 413.  The employer's knowledge may be "implied where the harassment is so pervasive that the employer should have known of its existence."  *Id*.  Here, the only conduct of Walterscheid that Hembrador argues created a hostile work environment that she reported to Pinto was Walterscheid repeatedly asking why she did not hang out by the pool at the national sales meeting.  As the Court found above, this comment on its own does not establish harassment or discrimination.  The Court has also concluded that Hembrador's listed actions do not amount to pervasive harassment such that Pinto or PruGen should have known about a hostile work

environment.  Thus, Hembrador's hostile work environment claim would fail for this reason as well.

**IV.     Conclusion**

In sum, the Court grants [44] Defendants' Motion for Summary Judgment on all counts. The Court also denies Hembrador's request for oral argument.  E.D. Mo. L.R. 4.02(a).  A separate judgment will accompany this Memorandum and Order.


So Ordered this 23rd day of March.

**STEPHEN R. CLARK**
**UNITED STATES DISTRICT JUDGE**